UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

MICHAEL HAGOOD,

Defendant.

20 Cr. 656 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to suppress a loaded handgun found by police officers during a warrantless search of a fanny pack worn by defendant Michael Hagood in the early morning hours of October 14, 2020. Hagood argues that his Fourth Amendment rights were violated when the officers, in the course of a nighttime vehicular patrol, exited their cars on Webster Avenue in the Bronx, stopped Hagood on suspicion that he had a firearm in his fanny pack, and conducted a warrantless search of the fanny pack. Hagood argues that the stop and search were unlawful, requiring suppression.

For the reasons that follow, the Court denies the motion to suppress.

I.      Overview and Procedural History

On December 1, 2020, Hagood was arrested, based on a complaint which charged him with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and (2). Dkts. 1, 5. On December 3, 2020, a grand jury returned a one-count indictment against Hagood charging the same offense. Dkt. 6.

This charge arose out of a stop by New York City police officers that occurred early on October 14, 2020 and that resulted in Hagood's arrest. Before his arrest, Hagood was standing in front of 1230 Webster Avenue, a housing project, in between a legally parked car and a car

double-parked in the bus lane.  He wore a fanny pack strapped across his upper chest and was

speaking to two other men.  New York Police Department ("NYPD") Officers John Migliaccio

and Nicholas Rios observed Hagood as they drove past him on Webster Avenue during a

vehicular patrol.  They decided to stop Hagood based on their suspicion that the fanny pack

contained a firearm.  The officers turned their vehicle around, parked, and approached Hagood

from the north, while two NYPD colleagues—Sergeant Steven Counihan and Officer Mike

Suarez, who had been following in a separate vehicle—parked and approached Hagood from the

south.  Sergeant Counihan reached Hagood first and—in the course of a brief struggle—

handcuffed him.  Officer Rios removed the fanny pack and searched it.  Inside were found, *inter

alia*, a loaded and operable Hi-Point semi-automatic, 9-mm pistol and two boxes of cigarettes.

On March 4, 2021, after receiving Rule 16 discovery, Hagood moved to suppress the

firearm on the grounds that it had been seized in violation of the Fourth Amendment.  Dkt. 17.

In support, he filed a memorandum of law, Dkt. 19 ("Hagood Mem."), and affirmations from his

counsel and himself, Dkts. 18 ("Levine Aff."), 18-2 ("Hagood Aff.").  On March 25, 2021, the

Government filed an opposition, asserting that the officers had reasonably suspected that Hagood

possessed a firearm, and that the facts known to them also gave them a reasonable basis on

which to suspect Hagood, a pedestrian, of various traffic infractions.  Dkt. 22 ("Gov't Opp'n").

On April 2, 2021, Hagood, with leave, filed a reply addressing the Government's latter

arguments.  Dkt. 27 ("Hagood Reply").

On May 10 and 11, 2021, the Court held a suppression hearing, at which it received

evidence including testimony from Officers Migliaccio and Rios and Sergeant Counihan.

Dkts. 46, 48 (together, "Tr.").  At the close of the hearing, the Court heard argument.  The Court

thereafter directed the Government to file a follow-up letter identifying statements within the

3500 material consistent with an aspect of the testimony of one officer.  Tr. at 426.  On May 14,

2021, the Government filed such a letter.  Dkt. 38 ("Gov't Supp. Ltr.").  At the hearing, Hagood

sought and was granted leave to file a letter addressing an issue the Court had raised regarding

the application of the inevitable discovery doctrine.  Tr. at 436–37.  On May 18, 2021, Hagood

filed such a letter.  Dkt. 42 ("Hagood Supp. Ltr.").

## II.    Factual Findings

### A.    Evidence Considered

The facts the Court finds are based on the evidence adduced at the hearing.

Three witnesses testified, all called by the Government: Officers Migliaccio and Rios,

and Sergeant Counihan.

As exhibits, the Court received (1) the firearm, magazine, and rounds, GX1; (2) the fanny

pack, GX2; (3) bodycam footage for Officers Migliaccio, GX3, Rios, GX4, and Suarez, GX5[1];

(4) still photographs drawn from bodycam footage, DXE-1 to 3 (still images from Rios bodycam

footage); DXF-1 to 3 (still images from Suarez bodycam footage); (5) surveillance videos from a

nearby business, DXG, DXH[2]; (6) still images drawn from this surveillance footage, DXG-1–6;

(7) aerial maps and photographs of the area, GX7–8 (aerial images), GX18 (photograph of 1230

Webster Ave.),[3] DXC-2 (photograph of west side of Webster Avenue); (8) photographs of

---

[1] Government Exhibits 3–5 were admitted pursuant to a stipulation.  *See* GX6 (stipulation); Tr. at 43–44.

[2] The time stamps for the surveillance videos have not been authenticated as accurate.  *See* Tr. at 339–40.  And the time stamps used on the different officers' bodycams are not consistent. Accordingly, per counsel's stipulation, the Court relies on the time stamps only to reflect the amount of time between events on the surveillance footage.

[3] GX18 was admitted for the limited purpose of showing the layout of the street.  Tr. at 28.

Hagood taken the day of the arrest, GX10, GX17; (9) a photograph of the firearm, magazine, and rounds, GX12; (10) an IT support ticket for Sergeant Counihan's bodycam, GX15; and (11) the team's bodycam checklist for Hagood's arrest, DXA.[4]

Although Hagood did not testify, the Court also considered his pretrial affirmation that recounted the events.

### B.    Facts Established

On a suppression motion, the Government bears the burden of proof by a preponderance of the evidence. *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010).

Based on the hearing, the Court finds the following facts.  Where the Court has cited testimony, it has credited that testimony, except as otherwise indicated.  The Court has given close attention to credibility determinations, in making which the Court considered the testimony at issue in light of, *inter alia*, the testifying witness's demeanor, competence, bias, overall testimony, and prior statements; and the extent to which the testimony was inherently logical and consistent with others' testimony and physical evidence (including videographic.  The Court has also considered counsels' thoughtful arguments regarding credibility, which were a focus of closing argument.

### 1.    Background and Responsibilities of the Testifying Officers

Officer Migliaccio has spent his four-year NYPD career patrolling Patrol Service Area 7 ("PSA 7").  Tr. at 17.  PSA 7 comprises, *inter alia*, the New York City Housing Authority ("NYCHA") complexes within the South Bronx, including the area bordered by Webster,

---

[4] The Court also received copies of four tweets from the PSA 7 Twitter account for the proposition that individuals in the neighborhood wear blue clothing.  *See* Tr. at 342.

Washington, Park, and Third Avenues between East 168th Street and Claremont Park. *Id.* He is presently assigned to a public-safety team. *Id.* at 17–19.

Sergeant Counihan has worked for the NYPD for nine years. *Id.* at 154. During the past three years, he has held the post of sergeant, and has been assigned to PSA 7 and to a public-safety team. *Id.* at 154–55.

Officer Rios has worked for the NYPD for eight years. *Id.* at 255. For approximately six years, including on October 14, 2020, he was assigned to the public safety team and patrolled PSA 7. *Id.* at 255–56. Substantiated complaints relating to illegal frisks or searches have been brought against him before the Citizen Complaint Review Board. *See id.* at 278–96.

### 2.   PSA 7 and the Webster and Butler Houses

In early morning hours of October 14, 2020, Officers Migliaccio and Rios were on duty patrolling the area around the Butler and Webster housing complexes. *Id.* at 21, 26. These together extend between East 168th Street and Claremont Parkway. *Id.* at 158–59, 261; *see also* GX7 (aerial map of Webster housing complex); GX8 (same). Both officers were uniformed but were patrolling in an unmarked police vehicle driven by Officer Migliaccio, with the windows rolled down. *Id.* at 21, 140, 260, 330. Neither officer was wearing a police cap. *Id.* at 140, 330. Officer Rios, who was nearest to defendant Hagood, testified that his entire police patch, which was worn near his bicep, would have been visible through the window due to his height. *Id.* at 330. A few car lengths behind the car driven by Officer Migliaccio was a second unmarked patrol car containing Sergeant Counihan and Officer Suarez, the latter of which was driving. *Id.* at 21, 158, 261.

All three testifying officers credibly attested that the area around the Butler and Webster housing complexes was marked by a high level of gang activity and violence. *See id.* at 19–20, 155, 159, 262. Three Bloods-affiliated gangs—the ED4, the Mac Ballers, and the Washside—

5

operate in the area. *See id.* at 25, 159, 262. Officer Migliaccio was specifically aware of Bloods gang activity in the housing complexes and rival gang activity on the west side of Webster Avenue; as a result of recent violence in the area, he and his colleagues had been on particular alert to the area in front of the two complexes. *See id.* at 19, 25–26. The public-safety team in PSA 7, Sergeant Counihan testified, attempts to "prevent or intervene in violent crimes" in the area, *id.* at 155, including, Officer Migliaccio testified, by "self-initiated" enforcement techniques, such as conducting stops, *id.* at 19. Because information regarding gang activity is frequently updated, Officer Migliaccio daily consults data and reports, supplied by the NYPD's field intelligence office, about crime in the area. *Id.* at 20. Sergeant Counihan similarly reviews daily emails from the field intelligence office, reviews a weekly email conveying intelligence as to crime in the area, and forwards updates to the officers who report to him. *Id.* at 156–57. Officer Rios also daily consults "intelligence alerts, complaint reports, and social media." *Id.* at 256–57.

### 3.     The Stop and Hagood's Arrest

At approximately 1 a.m., Officers Migliaccio and Rios were driving in the northbound lane on Webster Avenue. They crossed East 168th Street and soon, on their right, passed alongside 1230 Webster Avenue. *See id.* at 27; *see also* GX18. Officer Migliaccio was driving approximately 10 to 15 miles per hour. *See* Tr. at 27, 262–63. Immediately to the right of the northbound lane of Webster Avenue was a bus lane; to the right of the bus lane was a parking lane; to the right of that parking lane was 1230 Webster Avenue. *See* GX18.

Officers Migliaccio and Rios observed an SUV double-parked in the bus lane adjacent to 1230 Webster Avenue. Tr. at 29, 263. Both officers saw three men in or near the SUV. One was seated in the passenger seat of the SUV; two men, one of whom was Hagood, stood outside

the SUV. *See id.* at 29, 264. The three men appeared to be having a "conversation . . . or hanging out." *Id.* at 29.

Officer Migliaccio was able to observe the three men, who were illuminated by the headlights of his patrol car, the streetlights, and the lights from the businesses across the street. *Id.* at 30. As he drove past, he was able to get a direct view of Hagood, who stood near the rear of the double-parked SUV. *Id.* Officer Rios was also able to see Hagood, whose position was such that the officers' view of him as they drove by was not occluded by the double-parked SUV. *See id.* at 264–65.[5]

From a distance that he estimated to be about 30 feet away, Officer Migliaccio was able to observe that Hagood was wearing a blue sweatshirt and a fanny pack strapped over his shoulder and across his chest. *See id.* at 30–33. The fanny pack was stretched "very tight[ly]" across Hagood's chest; a portion of it was tucked under Hagood's arm. *Id.* at 33–35. At the hearing, Officer Migliaccio physically demonstrated how Hagood wore the fanny pack at the time the officer spotted him. *Id.* at 33–34. Officer Migliaccio explained that the fanny pack appeared "heavy, like there was a weighted object inside of it," and that he was able to observe "an elongated, rigid, solid object" with a "line" that was "hard at the top" outlined on the pack and that was consistent with the top slide of a gun. *Id.* at 35. Cross-examination on this point did not disturb this testimony. Officer Migliaccio specified that at this point he did not see the

---

[5] Officer Migliaccio incorrectly recalled that there had not been another vehicle parked in the bus lane behind the double-parked SUV. Tr. at 68. In fact, a second SUV was double-parked approximately one-and-one-half to two car lengths behind the SUV. This was revealed by a security video from a dentist's office across the street that the defense obtained and produced in its case at the hearing. *See* DXG at 1:06:22–1:07:17 (showing, through point at which Officer Suarez's car stopped near Hagood, a second double-parked SUV behind the one alongside which Hagood stood). Sergeant Counihan also did not recall another car being parked behind the SUV in the bus lane but was not certain that there had been no such car. *See* Tr. at 193–94.

full L-shape of a gun, but only what he perceived to be the slide (*i.e.*, the upper portion of the firearm). *Id.* at 111. Officer Rios and Sergeant Counihan also noticed the unusual bulge and the weight of the item in the fanny pack and that it was being worn in an unusual manner, although neither alerted to a horizontal rigid line as had Officer Migliaccio. *See id.* at 165, 266, 326–27. Officer Migliaccio also noticed that Hagood was wearing blue—which he recognized as a color sometimes worn by rival gangs of the Bloods. *See id.* at 32.

Based on their experiences and observations in law enforcement, Officers Migliaccio and Rios testified that, as of October 14, 2020, it was not customary for a person to wear a fanny pack strapped high across one's chest. *Id.* at 35, 265. Officer Rios acknowledged, however, that the practice of wearing fanny packs in this manner has since become more fashionable. *See id.* at 324, 327.

As of October 14, 2020, Officer Migliaccio had participated in approximately 10 to 15 stops in which handguns had been found in fanny packs. *See id.* at 149–50. His familiarity with the manner in which firearms present in such a pack, coupled with the elongated shape, rigidity, and apparent weight and bulkiness of the object in Hagood's fanny pack, and the unusual manner in which Hagood was wearing the fanny pack, led him to conclude that the item inside was likely a firearm. *See id.* at 35–36. Officer Rios similarly testified that in 2020, he had personally responded to 10 incidents in which firearms had been recovered from fanny packs carried by defendants. *Id.* at 266.

Officers Migliaccio and Rios each observed that, as their patrol car passed, Hagood appeared visibly agitated, with a "frozen" "deer-in-the-headlights" look; Officer Migliaccio testified that Hagood almost jumped. *Id.* at 36, 141, 266. Hagood's visible nervousness enhanced Officer Migliaccio's suspicion that the fanny pack contained a gun. *Id.* at 36. Officer

Migliaccio testified that he felt sure, in the moment, that Hagood had recognized that he and Officer Rios were police, presumably because, notwithstanding the unmarked car, both officers were in uniform. *Id.* at 63, 139–40. Once the officers' car passed Hagood and the men standing near him, the officers briefly lost sight of him. *Id.* at 267.

The amount of time the officers had to observe Hagood was disputed at the hearing. Officer Rios estimated that he had had between 15 and 30 seconds to observe Hagood. *See id.* at 304–05, 309–10. In fact, surveillance camera footage from outside a dentist's office across the street definitively showed that the officers had no more than two to three seconds to observe Hagood. *See* DXG at 1:06:49–52. Notwithstanding Officer Rios's inaccuracy on this point, the Court credits as accurate his and Officer Migliaccio's testimony recounting their observations of Hagood and the fanny pack as their patrol car approached and passed him. For experienced officers focused on Hagood, as the Court is persuaded the two officers were at the moment, a few seconds while driving at a low rate of speed were sufficient to observe a stationary and well-illuminated person wearing a weighted bag across his chest and acting in the manner described. Notably too, as the video footage of the scene reflects, the area was sparsely populated at the time (1 a.m.), with the streets perhaps unusually deserted due to the ongoing pandemic. As such, it is persuasive that the officers' attention—with few competing distractions—was drawn to Hagood.

After passing Hagood, Officer Migliaccio stated to Officer Rios, in substance, that he believed there was a firearm in the pack, in light of the heavy bulge, the shape matching the top slide of a gun, and Hagood's "really nervous" demeanor. *Id.* at 141. Using his radio's tactical channel, Officer Migliaccio radioed to the trailing car to notify Officer Suarez and Sergeant Counihan that he intended to perform a stop. *Id.* at 36–37, 61, 69–71, 141; *see also id.* at 166 (Sergeant Counihan, testifying that Officer Migliaccio initiated the stop), 267 (Officer Rios,

testifying that Officer Migliaccio radioed to communicate that he intended to perform a stop).[6]

Officer Migliaccio then performed a U-turn and began driving southbound in the northbound lane of Webster Avenue, headed towards the double-parked SUV. *See id.* at 37, 267; *see also* DXH at 1:07:08–16. Officer Migliaccio stopped his car approximately 10 feet apart from the double-parked SUV, with his car pointed nose-to-nose to the SUV. *See* Tr. at 37. The front half of Officer Migliaccio's car was in the bus lane and the back half stuck out into the northbound lane of Webster Avenue. *See id.*; *see also* DXH at 1:07:21. As Officer Migliaccio parked the car, he turned on his flashing lights. *See* Tr. at 89; *see also* DXH at 1:07:21.

Officers Migliaccio and Rios exited the patrol car and began to approach Hagood from the north, with Officer Migliaccio in the lead. *See* Tr. at 38, 267–68. As of this point, Officer Migliaccio regarded himself as conducting a *Terry* stop of Hagood, and did not regard Hagood as free to leave. *See id.* at 151.

Officer Migliaccio attempted to activate his bodycam after exiting the car, but, although he did not appreciate this at that moment, it did not start recording. He did not successfully activate it until after Hagood was in handcuffs. *See id.* at 41, 76–78, 79; *see also* GX3 at 1:08:41–49.[7] Officer Rios, however, activated his bodycam approximately 15 to 20 seconds after exiting the car. *See* Tr. at 273, 316; GX4 at 1:07:29–47.[8]

---

[6] Transmissions of this nature are not recorded. Tr. at 69–70.

[7] At that point, the footage from Officer Migliaccio's bodycam shows his hands adjusting his bodycam, *see* GX3 at 1:08:41, which he testified had been knocked off during the brief struggle with Hagood, *see* Tr. at 42.

[8] The bodycams in use by the NYPD at the time of the stop retroactively retained 30 seconds of video prior to the time the officer activated them, but these 30 seconds did not include sound. *See* Tr. at 73–74, 315–16.

Officer Migliaccio credibly testified that when Hagood saw the officers approaching him on foot, he appeared nervous and his chest was visibly rising from heavy breathing. *See* Tr. at 143–44. Officer Migliaccio observed Hagood take a step or motion away from the officers, and as Hagood did so, he clutched the fanny pack tighter, making the shape of the firearm within it, and in particular its handle, more pronounced. *See id.* at 136.[9]

Meanwhile, the car containing Sergeant Counihan and Officer Suarez pulled up behind the double-parked SUV—*i.e.*, on the opposite side of the SUV from Officer Migliaccio's patrol car—and parked. *See id.* at 166. The officers exited the car and walked toward Hagood. *See* DXG at 1:07:24–29; DXF-1 to 3. Sergeant Counihan was able to view Hagood from approximately 20 feet away as he approached him from the south; Hagood was initially facing northwest toward Officers Migliaccio and Rios. *See* Tr. at 162–63, 167–68. Among the officers, Sergeant Counihan reached Hagood first. As Sergeant Counihan drew close, he saw Hagood turn, see him, and, consistent with Officer Migliaccio's observation, begin to turn his body and bend his knees as if intending to run. *Id.* at 167–69.

Hagood, in his affirmation, attested that he did not attempt to flee. Hagood Aff. ¶ 5. It is correct, as the one item of pertinent video footage (Officer Suarez's) makes clear, that Hagood did not flee and that any initial movement on his part could not have been more than a step or so away.[10] However, the Court credits Sergeant Counihan's and Officer Migliaccio's accounts that

---

[9] In his affirmation, Hagood denied breathing heavily and grabbing the fanny pack at all, *see* Hagood Aff. ¶ 5, but, because Hagood elected not to testify, this assertion was not subject to cross examination. *See United States v. Medina*, 19 F. Supp. 3d 518, 535 n.13 (S.D.N.Y. 2014) (court may give sworn claim by defendant less weight where he did not testify) (collecting cases).

[10] Officer Suarez's was the only bodycam footage to capture this portion of events. *See* GX5. Although it makes clear that Hagood could not have moved far, the footage is inconclusive as to

Hagood took an initial step suggestive of an intention to flee. In all events, whatever Hagood's subjective intentions, he was unable to progress further away as of the time the officers, led by Sergeant Counihan, converged on him.

The events that ensued over the next approximately 15 to 20 seconds, beginning with the point at which Sergeant Counihan reached Hagood, were fast-moving and frenetic. They were the subject of considerable testimony. This period was dominated by a struggle between Hagood and the officers. The struggle resulted in Hagood being handcuffed and subdued, and with his fanny pack's being removed from his person and opened, yielding the firearm. Although the full sequence of movements during this scrum cannot be reliably determined with precision, the Court, on close review of the testimony and videographic evidence, can find the following.

First, early in this sequence, the officers reasonably perceived Hagood to signal some degree of resistance. As noted, both Sergeant Counihan and Officer Migliaccio, arriving from different directions, credibly testified to seeing foot and other motions by Hagood that, in the moment, they reasonably perceived, rightly or wrongly, to reflect an intent to flee.

Second, in response, the officers attempted to subdue Hagood and, during this process, Hagood and the officers, beginning with Sergeant Counihan early in the struggle, came into physical contact. From his vantage point, approaching from the other side of the double-parked

_____

whether Hagood moved at all away before Sergeant Counihan laid hands on him in an attempt to restrain him. *See id.* at 1:07:40–43. Sergeant Counihan's bodycam failed to record the events, Tr. at 174, although he did not appreciate this until later, *see id.* at 172; *see also* DXA (checklist from October 14, 2020, indicating that Sergeant Counihan had activated his bodycam). There is no basis to infer that Sergeant Counihan willfully caused his bodycam not to activate earlier. The bodycam had a documented history of problems, *see* GX15 (IT ticket) and Sergeant Counihan had first reported a problem to IT on October 9, 2020, *see* Tr. at 174; GX15. He was told to reset the camera, and did so. *See* Tr. at 174. After further problems, IT told Sergeant Counihan that the camera would need to be replaced, but he had not done so as of October 14, 2020, because obtaining a replacement camera would have required him to report to One Police Plaza, as nearer locations were closed due to the COVID-19 pandemic. *See id.* at 174–75.

SUV, Officer Migliaccio perceived Hagood turn with an apparent intent to run, and take one step

before seeming to collide with Sergeant Counihan. *See* Tr. at 96–100. Although Sergeant

Counihan did not recall a collision *per se*, *see id.* at 248–49, Officer Suarez's bodycam footage

reflects that short seconds after Sergeant Counihan's approach, Sergeant Counihan grabbed

Hagood, and about one second thereafter, swung his right arm over Hagood's neck and

shoulders, forcing Hagood's head down. *See* GX5 at 1:07:39–43. The two then remained in

close contact. *See id.*; DXF-1 (screen image from Suarez bodycam footage at 1:07:41); *see also*

Tr. at 169.

Third, the officers, led by Sergeant Counihan, then attempted to handcuff Hagood, a

process that took 10 seconds or more and that did not involve at its outset the issuance by any

officer of any verbal command to Hagood. *See* Tr. at 169, 196; GX5 at 1:07:41–43; GX4 at

1:07:45–55. Officer Migliaccio participated in this process; once he reached Hagood, he appears

to have placed his hands on Hagood's back to assist Sergeant Counihan. *See* GX5 at 1:07:42–44.

In this process, Sergeant Counihan testified, Hagood was flailing his arms and refusing verbal

orders to put his hands behind his back and to stop moving. Tr. at 170–72, 177. Officer Rios

similarly saw Hagood attempting to pull his arms away, which interfered with his being

handcuffed, leading Officer Rios, too, to run to assist Sergeant Counihan. *See id.* at 269, 273;

*see also* GX4 at 1:07:37. Upon reaching Hagood one to two seconds after Officer Migliaccio,

Officer Rios joined Sergeant Counihan in manually restraining Hagood. *See* GX5 at 1:07:43

(briefly showing Officer Rios reaching Hagood); *see also* Tr. at 269. Officers Migliaccio and

Rios credibly testified that, in light of Hagood's movements and apparent resistance and their

perception that his fanny pack likely contained a firearm, they believed that Hagood needed to be

handcuffed for the officers' safety. *See* Tr. at 48, 269.

Fourth, during the handcuffing process, various officers gave Hagood verbal commands to "stop" or "give me your hands." GX4 at 1:07:47–53. This is reflected on the audio on Officer Rio's bodycam footage, which begins approximately 15 to 20 seconds after Officer Rios exited his car.[11] The audio also captures the sound of handcuffs being open or closed. *Id.* at 1:07:48–56. Immediately before Hagood is fully handcuffed, Officer Migliaccio can also be heard on Officer Rios's bodycam footage stating, "I am going to hit him." GX4 at 1:07:54; *see also* Tr. at 45 (Officer Migliaccio confirming that this was his voice). Officer Migliaccio testified that he said this because Hagood's behavior seemed violent and because Hagood could potentially grab the firearm; he stated that he used these words to inform Hagood that force would be used if Hagood "didn't comply and deescalate his behavior." Tr. at 45. Approximately one second later, however, Officer Rios can be heard saying "he's cuffed" three times. GX4 at 1:07:55. Alerted to this, Officer Migliaccio did not, ultimately, strike Hagood. *See* Tr. at 47.

Fifth, Sergeant Counihan credibly testified that, before he handcuffed Hagood but while he was restraining and attempting to handcuff him, he made physical contact with Hagood and the fanny pack, and was able to feel an object "consistent with . . . the handle of a firearm." *Id.* at 170–72; *see also id.* at 205–07. Officer Rios also made contact with the fanny pack at some point during the struggle. He credibly testified that he felt a "hard object that had a weight to it that," based on his experience with firearms, he "believed to be a firearm." *Id.* at 269–70.

The precise sequencing of the officers' respective contacts with the fanny pack and the handcuffing is not determinate. But some aspects of the sequence can be discerned. As noted, Officer Suarez's bodycam footage shows Sergeant Counihan grabbing Hagood, and apparently

---

[11] Specifically, the footage reflects that the officers gave Hagood commands to "stop," GX4 at 1:07:46, "give me your hands," *id.* at 1:07:49, 52, and "stop moving," *id.* at 1:08:02.

reaching around Hagood's back.  *See* GX5 at 1:07:42.  As Sergeant Counihan swings his right

arm around Hagood's neck, his left arm appears to make contact with the front of Hagood's

person.  *See id.*  Officers Migliaccio and Rios then rushed to assist Sergeant Counihan.  *See id.*

at 1:07:43–44.  The audio from Officer Rios's bodycam shows that, thereafter, the officers

attempted to handcuff Hagood for at least 10 seconds, *see* GX4 at 1:07:45–55, a process whose

end is marked by Officer Rios saying, "he's cuffed."  *See id.* at 1:07:55.  The sound of handcuffs

clicking can be heard on Officer Rios's bodycam footage at various points during this struggle.

*See id.* at 1:07:48, 56.

Sixth, before Hagood was handcuffed, Officer Rios removed the fanny pack from

Hagood's person.  *See* Tr. at 245.  Although the timing of Officer Rios's ensuing touch of the

pack relative to the completion of the handcuffing process is uncertain, Officer Rios felt the

exterior of the bag and "felt again what [he] believed to be a firearm" based on the object's "L-

shape[]" and weight.  *Id.* at 270.  Officer Rios then searched the bag and discovered in it a loaded

firearm and a pack of cigarettes.[12]  *See id.*; *see also* GX12 (photo of contents of fanny pack at

time of stop).[13]  The firearm was a black Hi-Point semi-automatic, 9-mm pistol.  Tr. at 49.

Officer Migliaccio explained that Hi-Point handguns have "exaggerated features," including a

---

[12] In what Officer Migliaccio attested was an oversight, the cigarette packs were not vouchered
or maintained.  *See* Tr. at 114–15.  Although Officer Rios testified that he found one pack of
cigarettes, in fact, two packs of cigarettes were found in the bag.  *See* GX16 (showing two packs
of cigarettes in fanny pack).

[13] Officer Rios testified that although GX12 accurately shows the contents of the fanny pack at
the time of the stop, it does not portray the position of those contents within in the pack at that
moment, and that the firearm as depicted has had the magazine and bullets removed and the slide
pulled back.  *See* Tr. at 272.

bigger slide, by design. *Id.* at 50; *see also* GX16 (image of firearm recovered from fanny pack and other contents of the fanny pack).

Seventh, on his bodycam footage, Officer Rios can be heard stating "positive" after opening the fanny pack. *See* GX4 at 1:08:14. He testified that "positive" was a term used on his team to convey to colleagues that an officer had located a firearm. Tr. at 275. This statement is heard some 15 to 20 seconds after the sound of handcuffs being closed is heard and Rios says, "he's cuffed." GX4 at 1:07:55–1:08:14.

### 4.     Post-Arrest Events

Hagood was then driven to PSA 7 by Officers Migliaccio and Rios. *See* Tr. at 178, 275. Counihan and Suarez stayed behind with the two men with whom Hagood had been speaking. *Id.* at 243. Both men were calm and compliant during the encounter. *Id.* at 178, 329. Officer Suarez asked one man whether the double-parked SUV was his car; he confirmed it was. *See* GX5 at 1:08:05–07. Officer Suarez also patted down both men, *id.* at 1:08:08–44, and searched the double-parked SUV, including opening the glove box and the center console. *See id.* at 1:09:09–44; Tr. at 243. These searches did not uncover contraband. *See* GX5 at 1:09:09–44. The officers released both men, without recording their names or registration information for the car. *See* Tr. at 132–33, 244.

Officers Migliaccio and Counihan did not independently investigate whether any video cameras in the area had captured these events. They testified that they were told by a housing development officer that there were no security cameras in the area that could have done so. *See id.* at 57–59, 176, 181–83. More enterprisingly, the defense secured surveillance footage taken from a dentist's office across the street, which captured some of the above-described events from a distance. *See* DXG; DXH; *see also* Tr. at 337. The officers had not been aware of—nor had their memories been refreshed by—this footage at the time they testified at the hearing.

### III. Discussion

Hagood argues that the firearm found during the search of his fanny pack must be suppressed. First, he argues, the officers lacked reasonable suspicion to justify stopping him or conducting a frisk or protective pat down of the pack. *See* Hagood Mem. at 6–10. Second, he argues, even if a brief stop and frisk had been justified, his handcuffing by the officers converted the stop into a *de facto* arrest unsupported by probable cause, and that the seizure of the firearm resulted from that unlawful arrest. *See id.* at 10–12; Tr. at 380–81. In all events, Hagood argues, the search of the pack was a fruit of an unlawful seizure, requiring suppression of the firearm. *See* Hagood Mem. at 13; Tr. at 381–85.

The Court analyzes first whether the officers' stop of Hagood was justified by reasonable suspicion that a crime (gun possession) was afoot. Finding that the stop was so justified, the Court then considers whether the officers' ensuing restraint and then handcuffing of Hagood violated his Fourth Amendment rights and whether the seizure of the firearm was a fruit of any such violation.

For the following reasons, the Court finds that the Government has met its burden to show by a preponderance of the evidence that the officers lawfully stopped Hagood and lawfully searched the fanny pack and seized the firearm within.

#### A. Reasonable Suspicion to Stop and Frisk Hagood

##### 1. Applicable Legal Principles

Under the line of cases beginning with *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may conduct an investigative stop consistent with the Fourth Amendment when the officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity," *Navarette v. California*, 572 U.S. 393, 396 (2014) (quotation marks and citations omitted), and when the scope and manner of the stop is "reasonable," *United States v. Sharpe*,

470 U.S. 675, 682 (1985). A stop's reasonableness is determined by "whether the officer's action was [1] justified at its inception, and [2] whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quotation marks omitted) (quoting *Terry*, 392 U.S. at 20).

As to the first prong of the test, a stop is justified at its inception when the officer has a "reasonable, articulable suspicion" of criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see also, e.g.*, *United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."); *Sharpe*, 470 U.S. at 682; *United States v. Fiseku*, No. 15 Cr. 384 (PAE), 2015 WL 7871038, at *7 (S.D.N.Y. Dec. 3, 2015), *aff'd*, 906 F.3d 65 (2d Cir. 2018), and *aff'd*, 915 F.3d 863 (2d Cir. 2018).

As to the second prong, the critical inquiry is whether "the officers unreasonably used means of detention that were more intrusive than necessary." *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993). A stop justified under *Terry* may ripen into a *de facto* arrest, which to be valid must be supported by probable cause. *Id.*

> In determining whether an investigatory stop is sufficiently intrusive to ripen into a de facto arrest, the Second Circuit considers the "amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used."

*United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (quoting *Perea*, 986 F.2d at 645). "No one of these factors is determinative," *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004); "the reasonableness of the level of intrusion [depends on] the totality of the circumstances," *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991). The circumstances and actions

taken must be considered from the perspective of a reasonable officer. *Newton*, 369 F.3d at 673–74 ("A Fourth Amendment reasonableness inquiry asks would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" (quotation marks omitted) (quoting *Terry*, 392 U.S. at 21) (internal quotation marks omitted)). The Supreme Court has admonished lower courts, in conducting this inquiry, "not [to] indulge in unrealistic second-guessing." *Sharpe*, 470 U.S. at 686.

### 2. Discussion

#### a. *When Hagood Was Seized*

At the outset, to determine whether a brief investigative seizure of Hagood was justified under *Terry*, the Court must identify the point at which he was first seized. Although the parties agree that a seizure took place, they disagree as to when. Hagood argues that he was seized at the point when officers were approaching and closing in on him as he stood alongside the double-parked SUV. *See* Hagood Mem. at 4–5. The Government counters that Hagood was not seized until Sergeant Counihan physically restrained him alongside the double-parked SUV. *See* Gov't Opp'n at 11–12. The timing of the seizure matters because information that became known to the officers after the seizure began cannot be considered in determining whether reasonable suspicion justified the seizure. *See Terry*, 392 U.S. at 20 (the "officer's action [must be] justified at [the stop's] inception"). Here, the additional information cognizable, or potentially cognizable, if the initial seizure is situated later in time than when the officers first approached Hagood includes (1) Hagood's foot movements and gestures indicative of possible intent to flee; (2) his heightened nervousness; and (3) depending on when this contact occurred relative to Sergeant Counihan's physical restraint of Hagood, the officers' contact with the outside of the fanny pack, indicating an object inside consistent with a firearm.

A person has been "seized" within the meaning of the Fourth Amendment "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Indicia of such seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* "[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons." *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *Terry*, 392 U.S. at 19 n.16). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Mendenhall*, 446 U.S. at 552 (citation omitted).

On this threshold point, the Court holds with Hagood. At the point when the officers approached Hagood, he was boxed in on all sides—from the east and west, by the cars parked in the parking lane and the SUV double-parked in the bus lane, and from the north and south, by the two pairs of officers closing in on him. And the lights of Officer Migliaccio's car, which had parked immediately in front of the SUV, were flashing. A reasonable person in Hagood's circumstances would not realistically have regarded himself as free to leave. Various courts have recognized that when a defendant's vehicle has been boxed in by police vehicles, with flashing lights used as a show of authority, a seizure requiring reasonable suspicion has occurred. *See Pane v. Gramaglia*, 509 F. App'x 101, 103 (2d Cir. 2013) (summary order) (collecting cases).

That Hagood was on foot, as opposed to in a vehicle, does not alter this outcome. His egress was blocked on all four sides. To leave, he would either have had to hurdle the parked

cars or SUV, or elude the four uniformed officers, who were fast approaching with the obvious aim of engaging him. Indeed, Officer Migliaccio candidly testified that, at the point when the officers approached Hagood, he was no longer free to leave and that the officers were intending to stop him. *See* Tr. at 151 ("At that point, we were attempting to stop him—he was not free to leave at that point.").

The Government understandably seeks to defer until later the moment of seizure, to enable observations the officers made after closing in on Hagood to be considered in the reasonable-suspicion calculus. In arguing that Hagood had not been seized until Sergeant Counihan grabbed and physically restrained him, the Government relies on case law involving fleeing suspects, in which observations made during the process of flight have been held cognizable in determining whether there was reasonable suspicion. These precedents have deferred the point of seizure until the fleeing suspect has either obeyed an officer's order to stop, or has been physically restrained. *See* Tr. at 417 (citing *United States v. Simmons*, 560 F.3d 98 (2d Cir. 2009), and *United States v. Swindle*, 407 F.3d 562 (2d Cir. 2005)); *see also California v. Hodari D.*, 499 U.S. 621, 629 (1991); *United States v. Dixon*, No. 20 Cr. 368 (NSR), 2021 WL 1662492, at *10–11 (S.D.N.Y. Apr. 28, 2021). Based on these precedents, the Government argues, because the officers did not give Hagood a verbal order as they approached, Tr. at 168, and because Hagood responded to the approach by making a brief motion suggesting an intent to flee, *see id.* at 167–69, Hagood—even if a reasonable person would not have felt free to leave under the circumstances—was not seized until Sergeant Counihan grabbed and physically restrained him, *see id.* at 416–20.

This case authority is, however, properly distinguished. In *Hodari D.* and *Swindle*, the defendant fled either after seeing police or after police activated their lights, was pursued by

police, and was caught. *See Hodari D.*, 499 U.S. at 629; *Swindle*, 407 F.3d at 572. In these cases, the courts held, "because the seizure was not effectuated at the mere command to stop, the ensuing flight provided the police with reasonable suspicion for the seizure once they had caught up with the fleeing individual." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013). However, as the Second Circuit recognized in *Simmons* and later put the point in *Freeman*, "*Hodari D.* . . . and *Swindle*[] have no applicability where the initial seizure is neither broken away from or where the individual does not flee before he is seized." *Id.* at 97; *see also Dixon*, 2021 WL 1662492, at *10–11 (*Hodari D.* and *Swindle* not applicable where suspect, who allegedly made a "suspicious movement," was told to "show his hands" and was "surrounded by four plainclothes officers").

Such is the case here. Hagood was surrounded on all sides, with uniformed officers determinedly approaching from the north and south and police car lights flashing. This was a plain show of police authority directed at Hagood. A reasonable person would not have felt at liberty to buck this authority by leaving. And, unlike in the cases on which the Government relies, Hagood did not flee or break away from the approaching officers. Whatever inference about his intentions might be drawn from his limited motions as the officers neared—which essentially involved a single step by his pivot foot, perhaps accompanied by a bending of a knee or a modest turn of his body—Hagood did not put any further distance between himself and the officers. Accordingly, *Hodari D.* and *Swindle* are not applicable. And the Government has not cited any case extending those decisions to circumstances akin to these, where the suspect did not flee and where the officers merely inferred such an intention from his limited gestures.

Accordingly, the Court holds, Hagood was seized—and would not have reasonably viewed himself as free to leave—from the moment the officers began to close in on him.

Because Hagood was seized from that moment, to justify the seizure, the officers were required to have reasonable suspicion at that point that Hagood was engaged in illegal activity. "[T]he reasonable suspicion needed to justify the encounter is less than a fair probability of wrongdoing, and considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Bell*, 733 F. App'x 20, 21 (2d Cir. 2018) (summary order) (cleaned up). In determining whether the officers had reasonable suspicion to stop Hagood, the Court must "consider the totality of the circumstances surrounding the stop . . . [and] evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (cleaned up).

Here, the Government here mainly argues that, at the time they approached Hagood, the officers had reasonable suspicion to believe that he illegally possessed a firearm.[14] The

---

[14] As alternative bases for denying the motion to suppress, the Government argues that the facts known gave the officers a basis to believe that, as he stood near the double-parked SUV, Hagood was in violation of two traffic ordinances. Gov't Opp'n at 8–9 (citing N.Y. Veh. & Traf. Law § 1156 and N.Y.C. Dep't of Trans. Traf. R. § 4-08(f)(4)). Reasonable suspicion of infractions of this nature can justify a *Terry* stop. *See, e.g.*, *United States v. Santillian*, No. 13 Cr. 138 (RWS), 2013 WL 4017167, at *6 (S.D.N.Y. Aug. 7, 2013) ("[A]s long as [the officer] had reasonable suspicion to believe that a traffic violation had occurred, whether he had an 'ulterior motive' is irrelevant to the Fourth Amendment analysis." (citing *Whren v. United States*, 517 U.S. 806, 812 (1996), and *United States v. Dhinsa*, 171 F.3d 721, 724–25 (2d Cir. 1998))), *aff'd sub nom. United States v. Santillan*, 902 F.3d 49 (2d Cir. 2018). Here, however, the Court is unpersuaded that the known facts supplied reasonable suspicion of violations of either ordinance by Hagood.

First, New York state law prohibits pedestrians from walking in a roadway where a sidewalk is available. *See* N.Y. Veh. & Traf. Law § 1156(a) ("Where sidewalks are provided and they may be used with safety it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway."). There was no reasonable basis to suspect Hagood to be in violation of this provision. That is because it is undisputed that, as Officers Migliaccio and Rios passed Hagood, he was standing still, either in the parking lane or the edge of the bus lane. *See* Tr. at 27. The only cases, of which the Court is aware, in which this statute has been applied to a stationary

testifying officers each attested to having so suspected—and the suspicion proved correct. In particular, Officer Migliaccio, who made the decision to initiate the stop, recited the following observations and background knowledge as the basis of his suspicion to this effect: (1) he observed, in the fanny pack, which was stretched tightly across Hagood's chest, "an elongated, rigid, solid object" with a "line" that was "hard at the top" outlined on the pack and which was consistent with a firearm, Tr. at 35; (2) Hagood wore the fanny pack in a non-traditional way, strapped across his upper chest rather than at his waist, *see id.* at 35, 265; (3) Hagood had a nervous reaction as the police car passed, *see id.* at 36, 266; (4) the area alongside the housing complex where Hagood stood was marked by a high degree of crime and gang violence, *see id.* at 19–20, 159, 262; and (5) Hagood was wearing blue, a rival gang color to that of the Bloods, a dominant gang in the area, *see id.* at 32. The Court credits that these observations were made. Officer Rios's testimony, which the Court also credits on these points, was consistent with and

person involved persons who were standing in the middle of the roadway. *See Holmes v. City of New York*, No. 14 Civ. 5253 (LTS), 2018 WL 1604800, at *3 (S.D.N.Y. Mar. 29, 2018) (plaintiff walked into roadway to film arrest of protestor and ignored police commands to leave roadway); *Packard v. City of New York*, No. 15 Civ. 07130 (AT) (SDA), 2019 WL 11287678, at *10 (S.D.N.Y. Oct. 30, 2019) (video evidence showing plaintiff standing in road at various points was not dispositive because parties disputed whether sidewalk was safe to use), *report and recommendation adopted*, No. 15 Civ. 07130 (AT) (SDA), 2020 WL 1467127 (S.D.N.Y. Mar. 25, 2020). They are clearly inapposite here, where there is no claim that Hagood was in the main roadway.

Second, New York City traffic law prohibits individuals from "stand[ing] or park[ing]" a car in a bus lane. N.Y.C. Dep't of Trans. Traf. R. § 4-08(f)(4). As the text of this statute makes plain, however, it relates to the operation of a car, such that "standing" means "the stopping of a vehicle, whether occupied or not, otherwise than temporarily for the purpose of and while actually engaged in receiving or discharging passengers." *Id.* § 4-01. It is undisputed that Hagood was neither a passenger in the double-parked SUV as the officers drove by, nor the SUV's owner. An officer would not have had a reasonable basis to suspect Hagood of responsibility for any impropriety in the location or operation of the double-parked SUV.

largely corroborated these observations, although Officer Rios saw only a bulge in the fanny pack, not also the sharply drawn outline of a rigid object perceived by Officer Migliaccio. *See id.* at 165, 266, 326–27.[15]

Of these data points, by far the most significant are the observations made by Officer Migliaccio as to Hagood's fanny pack. An observation of a generic "bulge" under a suspect's clothing is usually insufficient to supply reasonable suspicion that the item underneath is a form of contraband. *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 614 (S.D.N.Y. 2013) ("[T]he outline of a commonly carried object such as a wallet or cell phone does not justify a stop or frisk, nor does feeling such an object during a frisk justify a search."). But where more is seen, the calculus changes, and observation of "an outline [of a firearm] can significantly contribute to a finding of reasonable suspicion." *Dixon*, 2021 WL 1662492, at *15 (collecting cases); *see also United States v. Price*, No. 13 Cr. 216 (RRM), 2014 WL 558674, at *9 (E.D.N.Y. Feb. 11, 2014); *United States v. Black*, 525 F.3d 359, 361–62, 365 (4th Cir. 2008) (the shape of a "slide of a semi-automatic handgun" in defendant's pocket contributed to reasonable suspicion).

Such is the case here. The Court carefully considered, and credits, Officer Migliaccio's testimony about his observations of the fanny pack. Because the fanny pack was strapped tightly across Hagood's chest, Officer Migliaccio testified, he was able to observe, outlined on the pack,

---

[15] Under the collective-action doctrine, where officers are working as a team, "an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001). Accordingly, it is of no consequence that the officers who first reached Hagood—Sergeant Counihan and Officer Suarez—did not have the full range of information known to Officer Migliaccio.

"an elongated, rigid, solid object" with a "line" that was "hard at the top"—a distinctive shape he believed was consistent with "the top slide of a handgun." Tr. at 35. In so reasoning, Officer Migliaccio drew upon his experience, which included numerous instances seizing firearms found in fanny packs during *Terry* stops and in searches incident to arrest. *See id.* at 35–36, 149–50.

The Court is mindful that a court in this District recently suppressed a firearm where it was unpersuaded by officers' testimony that they had seen a "telltale" bulge in the defendant's fanny pack, which was "slung over his [left] shoulder," prior to the stop. *Dixon*, 2021 WL 1662492, at *4, *15. The officers' testimony in *Dixon* focused primarily on the weight of the object, and the officers testified that the weight of the item(s) within the pack, coupled with the defendant's nervous manner, led them to conclude that the pack held a weapon. *Id.* at *15. Significantly, in *Dixon*, when the officers demonstrated at the hearing how the defendant had worn the fanny pack, the court did not perceive an outline of a gun. *See id.* at *16.

This case is distinguishable from *Dixon*. Most important, although Officer Migliaccio did not observe the full "L-shaped" outline reflecting the grip and barrel of a firearm, he did— unlike the officers in *Dixon*—observe a shape that, based on his experience with guns in fanny packs, he recognized as consistent with the slide of a firearm. At the hearing, Officer Migliaccio was unable, given his build, to don the fanny pack as had Hagood. But the Court—desirous of subjecting to proof Officer Migliaccio's testimony that the pack, when worn tightly on a chest, as Hagood had worn it, would reveal the outline of the slide of the Hi-Point semi-automatic 9-mm pistol—itself donned the fanny pack during the hearing, with that firearm inside. Consistent with Officer Migliaccio's account, a long horizontal outline consistent with the top slide of the pistol

was easily—indeed, dramatically—visible.[16]  The Court is thus firmly persuaded that this outline was visible at the top of the pack worn tightly by Hagood across his chest, that this outline was in fact seen by Officer Migliaccio as he drove past Hagood, and that this observation and the consequent (and correct) perception that the pack housed a gun prompted the officer to immediately stop the patrol car to enable further investigation.

This case also contrasts with *Dixon*, in that, there, the "officers did not testify that anything about their training made them particularly attuned to the likelihood that a weighted item in the cross-body bag was a gun." 2021 WL 1662492, at *16.  Here, however, Officer Migliaccio explained that, in addition to his experience with firearms generally, he was specifically familiar with how firearms present when held within fanny packs, based on approximately five *Terry* stops in which firearms had been found in fanny packs. *See United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008) (officer may "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person" (cleaned up)).

Although the telltale outline of the top slide of a gun is the single most important factor in the Court's overall assessment that the officers were reasonable to suspect that Hagood's pack held a firearm, other data points articulated by the officers validly reinforce that conclusion.

For one, Hagood was wearing the fanny pack in an unusual manner: across his chest rather than his waist.  Officer Rios credibly testified that, at the time, this was an uncommon way

---

[16] Officer Migliaccio's testimony on this point had important indicia of credibility.  Among others, his testimony aligned with the Court's own observations of the gun as it presented from inside the fanny pack at the hearing.  Officer Migliaccio was also measured in the extent of his recollection and observations.  He testified that, as he drove by, he was able to make out a shape consistent with the top portion of a gun—the slide—and a weight to the bulge consistent with a firearm.  He did not go beyond that to, for example, claim to have seen the "L-shape" of a gun.

to wear a fanny pack, and suggested that the contents of the pack might also be unusual (or unusually heavy).  Tr. at 324, 327; *see also* Gov't Supp. Ltr. at 1–2 (identifying 3500 material in which Officers Migliaccio and Rios noted that wearing a fanny pack across the chest was unusual and possibly indicative of criminal behavior).

For another, Officers Migliaccio and Rios credibly testified that, as the officers passed, Hagood had reacted nervously with a "deer-in-the-headlights" look.  *See* Tr. at 36, 266.  They both believed that Hagood had recognized them as officers from their uniforms, notwithstanding the unmarked vehicle.  *See id.* at 63, 139–40; *see also id.* at 330 (Officer Rios's "entire patch shows [from the window] when [he] sit[s] in the car").  "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."  *Wardlow*, 528 U.S. at 124.  Viewed in the context of Officer Migliaccio's other observations, Hagood's nervous look legitimately reinforced the officers' suspicion.

Finally, each officer credibly testified that aspects of their professional experience, in particular their familiarity with the area and block, reinforced their suspicion that Hagood possessed a firearm.  As of the date of Hagood's arrest, both officers had spent their entire post-academy police careers in PSA 7.  *See* Tr. at 17–19, 255–57.  They knew—and had received intelligence briefings—about the area where Hagood was seen and that it was associated with criminal activity, violence, and firearms.  *See id.* at 20, 156–59, 256.  Although the officers did not expressly testify that the time of night (1 a.m.) contributed to their suspicion, Officer Migliaccio did testify that he was able to observe Hagood more closely because there were "not a lot of cars on the road or obstructions."  *Id.* at 135.  And case law supports that a late-night hour may support suspicion of wrongdoing.  *See United States v. Williams*, 526 F. App'x 29, 32 (2d Cir. 2013) (summary order) (location in a high-crime area and late time of night, coupled with

suspect's suspicious behavior, gave officers reasonable suspicion to stop him); *Simmons*, 560

F.3d at 108 (finding it "relevant . . . though by no means dispositive, that the officers . . .

encountered [defendant] . . . at the apartment building, late at night, and in a high-crime area").

Officers may draw on such experiences in drawing inferences about an individual's

conduct, even where aspects of such information, on their face, may to the "untrained observer"

be "as consistent with innocence as with guilt." *United States v. Forero-Rincon*, 626 F.2d 218,

222 (2d Cir. 1980); *see also Padilla*, 548 F.3d at 183 (affirming denial of motion to suppress

where, in officer's experience based on eight to 10 arrests of suspects with guns in waistbands,

suspect's movements were "consistent with the adjustment of a gun lodged in one's waistband"

but not with an innocent explanation); *United States v. Wiggan*, 530 F. App'x 51, 55–56 (2d Cir.

2013) (summary order) (reasonable suspicion was supported by defendant carrying a gun in his

pocket, where officer testified that, in his experience, individuals in legal possession of firearms

used a holster under a garment, while those illegally in possession carried them in pockets,

waistbands, or inside coats); *United States v. Lucas*, 68 F. App'x 265, 267 (2d Cir. 2003)

(summary order) (officers were "entitled to draw on their experience that far more individuals

who carry concealed handguns do not have licenses than do"). To be sure, these observations in

isolation—absent those about the shape and weight evident in the fanny pack and Hagood's

nervous mien—would fall well short of establishing reasonable suspicion. *See Wardlow*, 528

U.S. at 124 ("An individual's presence in an area of expected criminal activity, standing alone, is

not enough to support a reasonable, particularized suspicion that the person is committing a

crime."); *Floyd v. City of New York*, 861 F. Supp. 2d 274, 298 (S.D.N.Y. 2012) ("Reasonable

articulable suspicion does not exist merely on the basis of [a high crime area and time of day]:

many people live in high crime areas and many crimes occur at night; simply being in a high

crime area at night is not suspicious behavior."). But, as the Supreme Court has held, "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Wardlow*, 528 U.S. at 124.[17]

Accordingly, the Court finds that, considered in the aggregate, the officers' observations supplied reasonable suspicion that—at the time the officers spotted him—Hagood possessed an illegal firearm inside his fanny pack, so as to justify a *Terry* stop. *See, e.g.*, *United States v. Ford*, 415 F. Supp. 3d 310, 314–15 (E.D.N.Y. 2019) (officers had reasonable suspicion to stop pedestrian whose pants created a large bulge with an outline consistent with a firearm and who was walking irregularly as the bulge moved down his leg); *United States v. Torres*, 252 F. Supp. 3d 229, 235 (S.D.N.Y. 2017) (officers had reasonable suspicion to stop pedestrian who "(1) was present in a high crime area late at night and (2) fled from individuals whom he knew to be police officers"); *United States v. Blake*, No. 16 Cr. 194 (MKB), 2017 WL 626603, at *4 (E.D.N.Y. Feb. 15, 2017) (officers had reasonable suspicion to stop defendant who was "in a high-crime area with a group of individuals after 1:00 AM"; one officer observed defendant "shift an object from the side of his waist to the groin area of his sweatpants"; and another officer "noticed an L-shaped object in the groin area of [defendant's] sweatpants"); *United States v. Grant*, No. 07 Cr. 729 (SJ), 2008 WL 897805, at *4 (E.D.N.Y. Mar. 31, 2008) (officers had

---

[17] The Court does not put any weight on Officer Migliaccio's observation that the blue color of Hagood's shirt might bespeak his association with a rival to the Bloods, known for wearing red. For a fact to support a reasonable suspicion, the reasoning process for this inference must be articulable. *See Sokolow*, 490 U.S. at 7 (officers may conduct an investigatory stop only if they have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'"). Officer Migliaccio's testimony did not coherently develop the thesis that rival gangs to the Bloods in the area are in fact known for wearing blue. And as Sergeant Counihan acknowledged that in this area, such gang habits "can change on almost a daily basis." Tr. at 229. Nor were the people with whom Hagood was conversing wearing that color. Sometimes a blue shirt is just a blue shirt. The officers' testimony here did not reasonably suggest more.

reasonable suspicion to stop defendant after observing him "adjust the bulge in his waistband to the right side of his body," which revealed the outline of a gun, and act furtively in an area in which the officers had recently heard gunshots).

<em>c.</em>    <em>Reasonable Suspicion to Frisk Hagood</em>

Having found that the officers reasonably suspected that Hagood possessed a gun in his fanny pack, the Court must consider next whether the officers' observations justified a protective frisk or patdown of Hagood's person. Under the *Terry* analysis, to conduct a protective frisk or pat down, the officer must have "reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*; *see also United States v. Oates*, 560 F.2d 45, 63 (2d Cir. 1977) (explaining that "the standard of suspicion necessary to allow a frisk for weapons is not a difficult one to satisfy"). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Padilla*, 548 F.3d at 187 (citation omitted).

Here, the same facts that supply reasonable suspicion that Hagood was committing a crime necessarily supply reasonable suspicion to justify a frisk for a weapon. That is because the crime which the evidence reasonably indicated Hagood was committing was gun possession. In general, whether a bulge supplying reasonable suspicion that a criminal offense is afoot can also "provide reasonable suspicion that someone is 'armed and dangerous' is a fact-driven inquiry." *United States v. Watson*, No. 20 Cr. 346 (JSR), 2021 WL 535807, at *6 (S.D.N.Y. Feb. 11, 2021). Here, Officer Migliaccio's observations clearly supported the inference that Hagood was armed and dangerous. He had seen an outline in the fanny pack that was familiar to him as the

top slide of a gun. His suspicion that a crime was afoot was specifically keyed to a gun offense. *See id.* at *7 (crediting officer's observation of a "heavy object weighing down on him which resembled the outline of a firearm" in a fanny pack, and finding that this "observation entitled the officers to conduct a *Terry* frisk of the fanny pack").

Moreover, although the observations that led Officer Migliaccio to initiate the stop fully justified a weapons frisk, additional observations made thereafter reinforced that suspicion. As the officers approached, Officer Migliaccio credibly testified, Hagood grabbed the fanny pack, which enabled the officer to more clearly perceive an outline consistent with a firearm. Hagood also made some sort of abrupt motion, indicative of flight. Hagood's grabbing of the fanny pack, the clearer outline of a gun that that grab revealed, and Hagood's abrupt motion reinforced the basis for concern that Hagood was armed and dangerous.

Accordingly, a protective frisk by the officers of Hagood's fanny pack was reasonably— indeed amply—justified. *See, e.g.*, *Williams*, 526 F. App'x at 32 (after officers approached defendant in street, defendant's "hostile response" and officer's "observation of a 'bulge' on the right side of [defendant's] thigh justified the subsequent frisk conducted to protect the officers' safety"); *Watson*, 2021 WL 535807, at *7 (officers had reasonable suspicion to frisk pedestrian with a "heavy-looking L-shaped object" in his fanny pack); *Torres*, 252 F. Supp. 3d at 235 (police had reasonable suspicion to frisk defendant who was "clutching" bulge in his pocket while fleeing from officers in high-gang activity area where shots were recently fired); *United States v. Monroe*, No. 08 Cr. 609 (ENV), 2009 WL 3614521, at *4–6 (E.D.N.Y. Nov. 2, 2009) (officer justified in conducting protective pat down where "defendant turned his body in a way that revealed an L-shaped bulge in his back pocket"); *United States v. Rios*, No. 09 Cr. 369

(CPS), 2009 WL 2602202, at *6 (E.D.N.Y. Aug. 24, 2009) (pat down was justified where officer saw an L-shaped item in defendant's pocket as defendant dismounted his bicycle).

### B. *De Facto* **Arrest**

Notwithstanding the officers' lawful authority to frisk the fanny pack, events took a turn after the officers approached. Perceiving Hagood, rather than passively acquiescing, instead to signal resistance or an intent to flee, the officers, led by Sergeant Counihan, restrained and eventually handcuffed him. Hagood seizes on the fact that he was handcuffed during the ensuing scrum—before the fanny pack was opened. He argues that the handcuffing transformed the event from a *Terry* stop into a *de facto* arrest, which was lawless because unsupported by probable cause, and that the officers' receipt of the gun was a fruit of the unlawful arrest.

For three independent reasons, the Court finds that argument unpersuasive. First, in the circumstances here, the brief handcuffing of Hagood did not amount to a *de facto* arrest, but was a reasonable step in the service of a lawful *Terry* stop. Second, even if the handcuffing did turn the encounter into an arrest, by the time the handcuffs were applied, the officers had come into possession of evidence supplying probable cause to arrest Hagood for gun possession. Third, even if the handcuffing gave rise to an arrest without probable cause, the officers' seizure of the gun does not warrant suppression, under the inevitable discovery doctrine.

***Handcuffs were justified for the* Terry *stop here.*** Under "ordinary circumstances, drawing weapons and using handcuffs are not part of a *Terry* stop." *Vargas*, 369 F.3d at 102 (quoting *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001)); *see also Newton*, 369 F.3d at 676 ("Handcuffs are generally recognized as a hallmark of a formal arrest."). However, as the Second Circuit has recognized, not every use of handcuffs during a *Terry* stop ripens the stop into an arrest. *See United States v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014); *see also Fiseku*, 2015 WL 7871038, at *8–10. Rather, this form of "intrusive and aggressive police conduct,"

*Vargas*, 369 F.3d at 102 (citation omitted), may be justified in the course of a *Terry* stop, where "police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat." *Bailey*, 743 F.3d at 340; *see also Newton*, 369 F.3d at 674 ("[W]here an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take necessary measures . . . to neutralize the threat without converting a reasonable stop into a *de facto* arrest." (cleaned up)) (holding that although the use of handcuffs placed the defendant in custody for purposes of the Fifth Amendment, the use of handcuffs was "reasonable to the officers' investigatory purpose under the Fourth Amendment").

Such was the case here. Hagood argues that handcuffing him exceeded the scope of a lawful *Terry* stop, converting it into an arrest. *See* Hagood Mem. at 10–12; *see also* Tr. at 384–87. But on the facts the Court has found, the officers had reasonable cause to use a degree of restraint on Hagood, incident to a justified *Terry* stop. As the assembled evidence set out above reflects, Hagood was seen by two officers making an initial step, and using other body language, indicative of an attempt to flee. And, for the reasons noted, the officers reasonably suspected Hagood of possessing a gun. Under these circumstances, it was clearly reasonable and proportionate for Sergeant Counihan to grab Hagood in an attempt to restrain him and assure officer safety. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). Critically, Sergeant Counihan credibly testified that, even after he had grabbed Hagood, Hagood continued to struggle, *see* Tr. at 177–78, and the bodycam evidence from Officers Rios and Suarez is consistent with that account, *see* GX4 at 1:07:45–55; GX5 at

1:07:41–43.  Officer Rios similarly testified that as he assisted Sergeant Counihan, Hagood continued to resist.  *See* Tr. at 269.  Under these fast-moving and fraught circumstances, it was reasonable for the officers to seek to handcuff Hagood, to assure their safety as they carried out the valid investigative purpose of the *Terry* stop: determining whether the fanny pack contained a firearm.  Indeed, Officer Rios explained just that—that he had determined, in the moment, that handcuffing the struggling Hagood was necessary to enable him to safely remove the fanny pack.  *Id.*

       The Court is mindful that handcuffs are an uncommon incident of a proper *Terry* stop, and that searching scrutiny is in order where the Government defends handcuffing as a part of such a stop.  But under the combination of circumstances here, the Court is persuaded that the officers reasonably found handcuffs necessary—and no more intrusive than necessary—to safely effect the *Terry* stop.  Accordingly, the stop did not ripen into an arrest, requiring probable cause.  *See, e.g.*, *Fiseku*, 915 F.3d at 873 (use of handcuffs during the investigatory stop was reasonable, in part, because it ensured the safety of the officer and the public during the stop); *Grice v. McVeigh*, 873 F.3d 162, 168 (2d Cir. 2017) (use of handcuffs during investigatory stop for explosives did not ripen into an arrest where handcuffs were used for the officer's safety during the stop and to prevent remote detonation of possible explosive); *Vargas*, 369 F.3d at 102 (use of handcuffs during stop was reasonable where officers had reliable information that suspect was armed, suspect fled, and suspect continued to struggle after he was stopped).

       ***Probable cause existed by the time handcuffs were applied***:  Even if the officers were not justified in using handcuffs to restrain Hagood in the course of the *Terry* stop, for the reasons above, Sergeant Counihan was surely justified in grabbing Hagood with his hands to prevent him from fleeing or resisting.  The Court finds by a preponderance that, in doing so, and at a point in

the struggle before Hagood had been successfully handcuffed, Sergeant Counihan made contact with the firearm in the fanny pack and felt a shape indicative of a firearm. This gave the officers probable cause before—albeit bare seconds before—handcuffs were applied.

As noted above, to effect a stop, officers may use force reasonably but no more intrusively than necessary to restrain a suspect without causing the stop to evolve into a *de facto* arrest. *See Vargas*, 369 F.3d at 101; *Perea*, 986 F.2d at 644. Even where handcuffs are not justified, to ensure safety or prevent flight, an officer may use his hands to restrain the subject of the stop. *See United States v. Vasquez*, 638 F.2d 507, 523 (2d Cir. 1980) ("[I]t was reasonable, in light of [defendant's fidgeting] movements, for each officer, in effecting a *Terry* stop, to place a restraining hand on one of [defendant's] arms . . . ."); *see also Graham*, 490 U.S. at 396 (officers are permitted to use some degree of force to effect an investigative stop). Here, given the credited testimony that the officers reasonably (1) believed Hagood to be armed and (2) perceived him to have made movements indicating an intent to flee, Sergeant Counihan was justified in grabbing Hagood with his hands to restrain Hagood. In the struggle that thereafter ensued, *see* Tr. at 177–78, 269, both Sergeant Counihan and Officer Rios made contact with the pack and felt a hard object consistent with a firearm. *Id.* at 170–72, 205–07, 269.

Although the precise sequencing is unclear, the Court finds by a preponderance that at least some of this contact occurred before handcuffs had been placed on Hagood. Officer Suarez's bodycam shows that Sergeant Counihan made contact with the front of Hagood's body almost immediately after grabbing him, *see* GX5 at 1:07:42, and maintained contact as Officer Migliaccio and Rios came forward to assist him, *see id.* at 1:07:43–44. Officer Rios's bodycam shows that the officers continued to struggle to fully handcuff Hagood for at least 10 seconds, *see* GX4 at 1:07:45–55, and only thereafter did Officer Rios call out "he's cuffed" three times,

*see id.* at 1:07:55.  To be sure, it is unclear whether, at this early point, the officers had secured a single handcuff to Hagood; the sound of handcuffs clicking can be heard on Officer Rios's bodycam footage at various points between 1:07:48 and 1:07:56 of GX4.  But the video evidence from Officer Suarez's bodycam shows sufficiently early contact between Sergeant Counihan and the front of Hagood's body—almost immediately after Sergeant Counihan grabbed Hagood—to permit a finding by a preponderance that Sergeant Counihan had felt a hard object consistent with a firearm *before* Hagood was even partly handcuffed.[18]

The assembled evidence at that point gave the officers probable cause to conclude that Hagood possessed a firearm.  From his car, Officer Migliaccio had seen the outline of the slide of an apparent firearm in Hagood's fanny pack; from a closer distance as he approached, he had seen Hagood tense and reveal more acutely the outline of a firearm; and Sergeant Counihan had manually felt a firearm through the fanny pack.  Even independent of Hagood's agitated behavior that the officers fairly read as indicative of consciousness of guilt, the officers' visual and tactile observations of the pack, in combination, supplied probable cause to believe Hagood then possessed a firearm.  *See, e.g.*, *United States v. Carrero*, No. 98 Cr. 959 (MBM), 1999 WL 97906, at *2–5 (S.D.N.Y. Feb. 24, 1999) (after observing an L-shape outline in pedestrian's pocket and feeling object with "unmistakable features of a pistol," officer had "probable cause to arrest [defendant] and to seize the gun" pursuant to plain-touch doctrine).[19]  Even if the ensuing

_____

[18] The video evidence does not, however, enable a similar finding as to the timing of Officer's Rios's first contact with the fanny pack.  Neither the video nor the audio situates that contact in time.

[19] The Supreme Court has recognized this doctrine as a corollary to the plain-view doctrine.  *See Minnesota v. Dickerson*, 508 U.S. 366, 371 & n.1 (1993).  It "provides that law enforcement officers may seize evidence discovered through the sense of touch during a lawful *Terry* frisk." *Watson*, 2021 WL 535807, at *7.  "The plain feel doctrine applies to the seizure of objects in

handcuffing gave rise to a *de facto* arrest, such an arrest was supported by the requisite probable cause.

      ***Inevitable discovery***:  Finally, even if the officers' actions in grabbing and handcuffing Hagood exceeded the bounds of a proper *Terry* stop, suppression of the firearm would not be in order under the inevitable discovery doctrine.  That doctrine provides a limited exception to the exclusionary rule, which requires that evidence seized unlawfully generally must be suppressed. *United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006).  Evidence obtained unlawfully is "admissible under the inevitable discovery exception to the exclusionary rule only where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *Id.*  Where the prosecution can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means, . . . the deterrence rationale has so little basis that the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 444 (1984).

---

containers as well as objects found on the person of a suspect." *United States v. Colon*, No. 10 Cr. 498 (RPP), 2011 WL 569874, at *13 (S.D.N.Y. Feb. 8, 2011); *see also United States v. Ocampo*, 650 F.2d 421, 429 (2d Cir. 1981) ("Where the contents of a container are easily discernible by frisking the exterior of a package, . . . it would be a pointless formality to require that the agents first obtain a warrant before examining the contents.").  However, where the *Terry* frisk does not reveal an object consistent with a weapon, "the officer may not continue to manipulate an object disclosed during the frisk and then seize it when such manipulation reveals its incriminating character." *United States v. Rogers*, No. 95 Cr. 1136 (MBM), 1996 WL 422260, at *6 (S.D.N.Y. July 29, 1996), *aff'd*, 129 F.3d 76 (2d Cir. 1997).  Applying the plain-feel doctrine, once an officer had touched the outside of Hagood's fanny pack and discerned that it held an object consistent with a firearm, they were authorized to seize the pack and to open its contents.  And there is no coherent basis to dispute that an officer touching the outside of the pack would not have felt the gun.  Both Sergeant Counihan and Officer Rios made contact with the pack during the struggle with Hagood and perceived a firearm within, *see* Tr. at 170–72, 205–07, 269, and Officer Rios's frisk of the bag after its removal from Hagood's person yielded the same result, *id.* at 270.

The inevitable discovery doctrine has frequently held to apply where courts determine that the contraband at issue would have been found in a search incident to a lawful arrest. *See, e.g.*, *Santillan*, 902 F.3d at 59 (cash unlawfully seized during a frisk was admissible where it would inevitably have been discovered during a search incident to an arrest); *United States v. Rahman*, 189 F.3d 88, 120 (2d Cir. 1999) (unlawfully seized forged passports were admissible where they would have inevitably been discovered during a search incident to arrest for an assault); *United States v. Garcia*, 279 F. Supp. 2d 294, 303 (S.D.N.Y. 2003) (unlawfully seized drugs were admissible where they would have been discovered pursuant to a search of defendant's person incident to lawful arrest). Albeit less frequently, the doctrine has been held to apply where—although the suspect's arrest appeared unjustified—the evidence in question would have been revealed by a properly conducted *Terry* stop. *See, e.g.*, *United States v. Gonzalez*, No. 08 Cr. 363 (BSJ), 2009 WL 613201, at *6 (S.D.N.Y. Mar. 4, 2009) (applying inevitable discovery to *Terry* stop and protective sweep of car), *aff'd*, 441 F. App'x 31 (2d Cir. 2011) (summary order), and *aff'd*, 470 F. App'x 2 (2d Cir. 2012) (summary order).

Such is the case here. The Court has held that the officers had reasonable suspicion to stop Hagood on the basis that his fanny pack held a weapon, and a reasonable basis to frisk the pack for that purpose. The officers had lawfully approached Hagood for the purpose of carrying out that stop, and were closely surrounding Hagood at the time that any ostensible unlawful police action—whether the grab of his person or the application of handcuffs—occurred. Insofar as these acts of alleged overreach involved contact with Hagood's person, the officers were virtually upon the fanny pack at that moment. It follows that, had there been no illegality, it is inevitable that, within seconds, the officers would have frisked the fanny pack. And insofar as Officer Rios's frisk of the pack revealed an object consistent with a firearm, *see* Tr. at 270, it is

inevitable that a frisk unprefaced by grabbing or handcuffing Hagood would have yielded the same result. And that revelation—that the object inside the pack felt like a gun—would have justified the officers in searching the bag, either because the observation gave the officers probable cause to arrest Hagood and to search the bag incident to his arrest, or pursuant to the "plain-feel" or "plain-touch" doctrine. *See United States v. Lopez*, 321 F. App'x 65, 68 (2d Cir. 2009) (summary order) (while grabbing defendant's arm during stop, officer "felt a hard object in [defendant's] right front pocket" and was therefore entitled to search the pocket to "investigate this suspicion"); *United States v. Morales*, 549 F. Supp. 217, 223–24 (S.D.N.Y. 1982) (officer who felt a hard object inside duffle bag and had reasonable suspicion to believe the bag contained a weapon was entitled to search the bag even though defendant had moved some distance away); *United States v. Perez*, 574 F. Supp. 1429, 1437 (E.D.N.Y. 1983) ("[Officer] testified that when he grabbed [defendant's] bag he felt what he suspected was a handgun . . . . Thus he was entitled to search the bag for weapons." (cleaned up)), *aff'd sub nom. United States v. Torres*, 740 F.2d 122 (2d Cir. 1984).

Hagood argues that, as a matter of policy, the inevitable discovery doctrine ought not apply to street stops, given their "highly fact-specific nature[.]" Hagood Supp. Ltr. at 2. He is correct that, in many contexts involving improperly executed *Terry* stops, a court will not be able to reliably find that, absent the police illegality, the contraband or evidence at issue would have been uncovered. Nor ought a court deploy the inevitable discovery doctrine to avoid resolving hard "questions about the legality of [a] frisk and resulting seizure" resulting from a *Terry* stop. *United States v. Ramirez*, No. 02 Cr. 1228 (GEL), 2003 WL 260572, at *3 (S.D.N.Y. Feb. 5, 2003). But this case presents neither of these pitfalls. The Court can comfortably find here that the officers—even if not permitted to grab or handcuff Hagood—in short order assuredly would

have frisked the fanny pack, inevitably revealing the loaded, Hi-Point semi-automatic, 9-mm pistol that sat within. And, far from ducking questions of the legality of police conduct, the Court here has systematically evaluated the Fourth Amendment challenges raised by the defense and has not found any illegality.

## CONCLUSION

For the foregoing reasons, the Court denies Hagood's motion to suppress the physical evidence obtained during the street stop on October 14, 2020. The Clerk of Court is respectfully directed to terminate the motions pending at dockets 17, 22, and 42.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 15, 2021
New York, New York